STATE of Wisconsin, Plaintiff-Respondent,

v.

Oscar CARTAGENA, Defendant-Appellant.

Supreme Court

No. 79-1285-CR. *Submitted on briefs October 1, 1980.—Decided January 6, 1981.*

(On certification from Court of Appeals.)
(Also reported in 299 N.W.2d 872.)

For the appellant the cause was submitted on the briefs of *Louis B. Butler, Jr.,* assistant state public defender.

For the respondent the cause was submitted on the brief of *Bronson C. La Follette,* attorney general, and *Jerome Schmidt,* assistant attorney general.

DAY, J. The primary question presented in this appeal is: Did the trial court err in refusing to submit defendant's requested verdict of endangering safety by conduct regardless of life,[1] (endangering safety), as a lesser included offense of attempted first-degree murder?[2]

---

[1] Sec. 941.30, Stats. 1975. "**Endangering safety by conduct regardless of life.** Whoever endangers another's safety by conduct imminently dangerous to another and evincing a depraved mind, regardless of human life, may be fined not more than $1,000 or imprisoned not more than 5 years or both." Amended L. 1977, c. 173, sec. 40, effective June 1, 1978.

[2] Sec. 940.01, Stats. 1975. "**First-degree murder.** (1) Whoever causes the death of another human being with intent to kill that person or another shall be sentenced to life imprisonment.

"(2) In this chapter 'intent to kill' means the mental purpose to take the life of another human being." Amended L. 1977, c. 173, sec. 5, effective June 1, 1978.

"939.32. **Attempt.** (1) Whoever attempts to commit a felony or a battery as defined by s. 940.20 or theft as defined by s. 943.30 may be fined or imprisoned or both not to exceed one-half the maximum penalty for the completed crime; except that for an attempt to commit a crime for which the penalty is life imprisonment, the actor may be imprisoned not more than 30 years. Whoever attempts to commit a battery as defined in s. 940.205 may be imprisoned not more than one year in the county jail.

"(2) An attempt to commit a crime requires that the actor have an intent to perform acts and attain a result which, if accomplished, would constitute such crime and that he does acts toward the commission of the crime which demonstrate unequivocally, under all the circumstances, that he formed that intent and would commit the crime except for the intervention of another person or some other extraneous factor." Amended L. 1977, c. 173, sec. 2, effective June 1, 1978.

The defendant also claims the trial court committed reversible error by admitting evidence of a prior crime and by misstating the law in its self-defense instruction.

The defendant was convicted of injury by conduct regardless of life[3] for a shooting which occurred on October 7, 1978, and also convicted of attempted first-degree murder for a second shooting which occurred on October 19, 1978. The cases were tried together. He was placed on probation for seven years for the October 7th shooting which was to run consecutive to the twelve-year sentence he received for the attempted murder conviction. The latter sentence was made concurrent to a sentence being served for a conviction not involved in this appeal.

On June 30, 1980, this court accepted certification of this appeal from the Court of Appeals pursuant to sec. 809.61, Stats. 1977, because the primary question raised was also before this court in *Hawthorne v. State,* 99 Wis. 2d 673, 299 N.W.2d 866 (1981), and *Walker v. State,* 99 Wis.2d 687, 299 N.W.2d 861 (1981). In each of these cases, the defendant was charged with attempted first-degree murder, claimed the privilege of self-defense and requested submission to the jury of the lesser offense of endangering safety. After oral arguments were heard on *Hawthorne v. State, supra,* and *Walker v. State, supra,* this court ordered the parties in each of the three cases to submit supplemental briefs restricted to the question: Is endangering safety a lesser included offense of attempted first-degree murder, consistent with our opinion in *Randolph v. State,* 83 Wis.2d 630, 266 N.W.2d 334 (1978) ?

The facts relevant to this appeal involve three separate shooting incidents. One shooting resulted in defendant's conviction on a count of injury by conduct regardless of

[3] "940.23. **Injury by conduct regardless of life.** Whoever causes great bodily harm to another human being by conduct imminently dangerous to another and evincing a depraved mind, regardless of human life, is guilty of a Class C felony."

life. The second shooting resulted in defendant's conviction of attempted first-degree murder and is central to this appeal. These charges were tried together. The third shooting, which occurred earliest in time, is the subject of the defendant's challenge to the admission of "other crimes" evidence, but the defendant was not tried on any charges arising from that shooting.

On October 7, 1978, the defendant and three others, including Modesto Fontanez, were riding together in a car. Fontanez and another passenger in the car, Luis Bermudez, testified that Bermudez was shot by the defendant's gun following an argument between the defendant and the fourth passenger, Benigno Cavazos. The defendant testified that the shooting was accidental. This incident led to defendant's conviction of injury by conduct regardless of life.

Fontanez testified that after this shooting, the defendant threatened him, warning that the police better not find out about the defendant's involvement in the shooting. Fontanez stated that defendant had threatened to kill him or get at him in some other way if he reported the incident to the police. Fontanez testified that on October 18, 1978, he attempted to call the police from the home of a friend, Steve Casada. Casada was also an acquaintance of the defendant.

On October 19, 1978, the defendant went to Fontanez's house. At that time another shooting occurred, which led to defendant's conviction of attempted first-degree murder.

Fontanez described that incident this way. A boy rang the doorbell of his home. Wilda Maldonado, who was also living in the home, answered the door. Ms. Maldonado told Fontanez that the boy wanted to talk to him. Fontanez went to the door. The boy asked if he could come in and Fontanez opened the screen door. The defendant then pushed the boy aside and down the stairs, "came in shooting." Fontanez was hit in the stomach.

After being shot, he ran into the bedroom to get his rifle and shot a couple times to scare the defendant, but the defendant did not leave. Fontanez fell to the floor, saw the defendant point the gun at him, and call him a "snitch." Fontanez pretended he was dead and the defendant left.

A police officer testified from an interview with Fontanez in the hospital the day after the shooting. Fontanez stated at that time that, after Fontanez had been shot and was lying on the floor, the defendant stood over him and said:

"That's what you get for being a snitch, I should kill you."

Fontanez then stated that he closed his eyes and "played dead" because he thought the defendant would kill him. The defendant left.

Ms. Maldonado testified that at about 6:15–6:30 p.m. on October 19, 1978, she saw the defendant walk past the house. Shortly thereafter, she looked out the window and did not see him. Ms. Maldonado, Fontanez and another, Jose Fuentes, were watching television when a boy came to the door and rang the doorbell. Ms. Maldonado answered the door and the boy asked for Fontanez. Ms. Maldonado called for Fontanez and went to her baby's bedroom. She did not see the defendant. Ms. Maldonado heard what sounded to her like doors "hit against the walls," and she heard two shots. Ms. Maldonado came out of the bedroom and saw Fontanez walking back to the other bedroom saying, "No, Oscar, no." Ms. Maldonado saw the defendant shoot two more times. Fontanez's rifle was kept in the bedroom. Prior to the defendant entering the house, Ms. Maldonado did not see the rifle in the hands of Fontanez. Ms. Maldonado grabbed the baby and ran out the front door. Fontanez did not have a weapon when she left the house. Ms. Maldonado ran into the alley and saw the automobile the defendant was

driving, with the engine running. Later, she returned to the house with others, and Fontanez answered the door bleeding and holding his rifle.

The boy, Paublo Guteriz, testified that he had a conversation with the defendant during the afternoon of October 19, 1978, about obtaining marijuana for himself. The defendant took Guteriz to a house on Washington Street and told him to go up to the house and ask for "Moe." The defendant parked the car in the alley and left the motor running. Upon the request of the defendant, Guteriz gave him a brown bag from the glove compartment of the car which contained something hard. Guteriz and the defendant went to the door together. Guteriz rang the doorbell. The defendant was standing to the side of the door with his back to the building. A woman answered the door and went to get Fontanez upon the request of Guteriz. Fontanez came to the door and was not carrying a rifle. The defendant pushed Guteriz back and went into the house. Guteriz heard someone swear and also heard some shots. He then ran from the house.

The defendant testified that he took the boy to Fontanez's house to obtain marijuana at about 7:00–7:30 p.m. The boy rang the doorbell while he was standing to the side of the door, but not with his back to the wall. Ms. Maldonado answered the door and went to get Fontanez. Fontanez came to the door and when he saw the defendant, he ran. The defendant walked in after him and the next time he saw Fontanez, he shot the defendant in the forehead with a rifle. The defendant described his own reaction as follows:

"I fell behind the wall. I grabbed a .25 off of the TV, had loaded already, and I went to load it, and live round came flying out of the chamber, and I shot twice, and he had already fired four or five shots at me. . .'

After the shooting, Fontanez collapsed to the floor of the bedroom. The defendant testified that:

"[W]ell, when he got shot, he was laying down in the bedroom. I walked up to him, Jose Fuentes went running past me outside, and his girlfriend was still standing there, and she just grabbed the baby, and I walked into the bedroom and he was laying there, and I asked him, I said, 'Moe, why did you shoot me?' and he says—'You listen to what people say.' And then I was picking him off the floor, and I told him, I said, 'I'm going to take you to the hospital,' and he says, 'No, I don't want to go to the hospital.' He says, 'It hurts too much.' Then he got up and he was walking behind me, and then I just seen a—police coming. I went through the back, got in my car, and I took off."

The defendant denied that he had threatened Fontanez. He did admit to shooting Fontanez, but claimed he was acting in self-defense.

Other witnesses testified in support of the defendant's claim of self-defense, stating that Fontanez had threatened to kill the defendant if he ever came to Fontanez's house.

The defendant was charged with one count of injury by conduct regardless of life for the October 7 shooting of Bermudez and one count of attempted first-degree murder for the October 19 shooting of Fontanez. The cases were tried together.

At the close of evidence, the defendant requested that the court submit verdicts of endangering safety as lesser included offenses of both counts. The court submitted endangering safety as a lesser included offense of injury by conduct regardless of life, but refused to submit endangering safety as a lesser included offense on the attempted first-degree murder charge.

The jury was instructed on the privilege of self-defense.[4]

The jury returned verdicts of guilty on one count of injury by conduct regardless of life and one count of attempted first-degree murder. Judgments of conviction were entered on March 20, 1979.

---

[4] Wis J I—805, 815–CR.

The defendant filed a Notice of Appeal on August 15, 1979.

The defendant claimed on appeal that the trial court erred in refusing to submit a verdict of endangering safety as a lesser included offense on the attempted murder charge.

In *Hawthorne v. State, supra,* this court reaffirmed its prior holdings that endangering safety is a lesser included offense of attempted first-degree murder. We also noted in *Hawthorne* that submission of a lesser included offense is proper only when there are reasonable grounds in the evidence both for acquittal on the greater charge and conviction on the lesser offense, and that it is prejudicial error if the court improperly fails to submit the lesser included offense to the jury. Finally, we found that a claim of self-defense to a charge of attempted first-degree murder does not necessarily preclude submission of the included offense of endangering safety.

In refusing the defendant's requested verdict on endangering safety, the trial court stated:

"In regard to the second count, the Court will not submit the lesser included, because I think the evidence admits—viewed in the light most favorable to each proponent of his position—admits of only two views. One view would support attempted murder, first degree. All the State's evidence points toward an intentional act, to punish or silence a snitcher. All of the State's (sic) evidence goes towards self-defense, and there is evidence that would support that view. I don't see any intermediate position at all for the Court to suggest—to submit any other count which would simply be to invite compromise."

As stated in *Hawthorne,* a claim of self-defense does not necessarily preclude submission of endangering safety. The question is whether there are grounds in the evidence for acquittal on the greater charge and conviction on the lesser offense. *Hawthorne v. State,* 99

Wis.2d 673, 682, 299 N.W.2d 866 (1981); *Jordan v. State,* 93 Wis.2d 449, 468, 287 N.W.2d 509 (1980).

Conviction of attempted first-degree murder requires proof of two elements:

". . . (1) A specific intent to take the life of another human being; and

"(2) An unequivocal act which, except for the intervention of some extraneous factor, would have resulted in the death of that individual . . ." *State v. Schenk,* 53 Wis.2d 327, 332, 193 N.W.2d 26 (1972).

There was evidence in this case that would support the jury's finding that defendant intended to kill Fontanez. There was also evidence which, if believed by the jury, would establish self-defense. Finally, there was evidence from which the jury could reasonably conclude that the defendant lacked the specific intent to kill.

The defendant testified that, after Fontanez was shot and was lying on the bedroom floor, he attempted to take Fontanez to the hospital. In addition, the victim, Fontanez, stated in the police interview that the defendant stood over him as he was wounded on the floor and said: "That's what you get for being a snitch, I should kill you." Fontanez says he then closed his eyes and "played dead" and the defendant left the house. Whether the jury found that defendant acted in self-defense or not, they could reasonably find from this testimony that the defendant lacked intent to kill, and intended only to punish Fontanez for attempting to report the earlier shooting to police.

The Court of Appeals, in its certification of this appeal, noted that:

"The defendant was accused of accosting the victim in order to, in the trial judge's own words, 'punish or silence a snitcher.' There is evidence in the record from which the jury could believe that the defendant sought to harm or punish him, but not kill him. Punishing another per-

son in retaliation for going to police is certainly an actionable wrong, but it is not necessarily attempted first-degree murder . . .

"When a defendant shoots another man in the stomach, as was the case here, and then stands over him and says he *should* kill him for snitching to the police but does not discharge any more bullets into the wounded person, a jury can, if allowed, find that there was intent to harm, not to kill . . ." (Emphasis in original.)

We agree with the analysis of the Court of Appeals and reverse the conviction on the attempted first-degree murder charge and remand for a new trial.

The defendant also argues that it was prejudicial error to allow testimony about another shooting incident in the trial on the charges stemming from the shootings of Bermudez and Fontanez.

At the end of the state's case-in-chief, the prosecutor advised the court and defense counsel, that if defendant testified, the prosecutor intended to question him about a third shooting incident which occurred before the two shootings for which the defendant was on trial. The prosecutor stated to the trial court:

". . . I intend to question Mr. Cartagena concerning an incident that occurred approximately, I think it's two or three weeks before, where he admitted that he went to a home at 1508 South 10th Street and fired numerous —four times into a house in an attempt to scare a person he believed to be in the house to pay back some money that was owed to him, and he also made admission concerning this to Detective Sandoval, and I'm not, you know, sure what he will testify to concerning that, but it certainly is relevant in this regard because it goes to show that Mr. Cartagena is in fact dangerous, he does attempt to threaten and frighten and intimidate people, and that certainly is one of the major issues in the motivation at least under the theory of the State's case that we're concerned with here; so I intend to ask him about that."

At that point, the trial judge stated he would sustain a defense objection to such questions because it would violate the rule against the admission of evidence of other crimes citing sec. 904.04(2), Stats., stating: "you're trying to show he acted consistent with prior conduct."

Later, after the defense put in part of its case, the court suggested that it might reconsider its position on this testimony stating that it may be admissible if "it bears on intent."

The prosecutor raised the question again after defendant testified on direct examination. The trial court then reversed its earlier ruling, stating:

"I think it is material, and because this is not a case where the State offers the evidence merely to round out its proof of all the elements of the crime. Here's a situation where the defendant has come forward with a different version which is in direct contradiction to the State's version, the version proposed by the State. The matter of threats has permeated some of the testimony, and in balance, the Court, considering factors on both sides, the Court will permit the questions to be asked."

The defense again objected.

Evidence of prior crimes is governed by sec. (Rule) 904.04(2), Stats., which provides:

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. This subsection does not exclude the evidence when offered for other purposes, such as proof or motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

The state argues that this testimony was admissible under any of three of the sec. 904.04(2), Stats. exceptions: intent and motive (with respect to the Fontanez shooting) and absence of accident (in the Bermudez shooting). This court has also held that prior conduct evidence may be admitted to show depravity of mind, .

under the proper circumstances, *Hammen v. State*, 87 Wis.2d 791, 798, 275 N.W.2d 709 (1979), and the state argues that the testimony was admissible for that purpose here.

The state first asserts that the testimony relating to the "house shooting" was probative of the defendant's motive or intent in the Fontanez shooting. In its brief, the state contends that the testimony "was relevant to show the intent of [the defendant's] visit—to intimidate, scare, threaten or shoot Fontanez." Similarly, the state contends the challenged testimony concerning the house shooting tended to show defendant's motive in going to Fontanez's house.

In *Holmes v. State*, 76 Wis.2d 259, 251 N.W.2d 56 (1977), this court affirmed the trial court's admission of testimony concerning an armed robbery in an attempted murder prosecution. There testimony concerning the armed robbery was found admissible, because it was probative of the defendant's motive for the attempted murder.

The court stated:

". . . evidence relating to the armed robbery was relevant to the issue of the attempted murder charge, in that it provided the motive for the shooting at the police officer. The armed robbery, the flight with the officers in pursuit, and the attempted murder to evade apprehension, all arose out of a single transaction. The reason that the defendant shot at the police officer was to attempt to thwart his apprehension for the armed robbery." *Holmes, supra,* 76 Wis.2d at 267.

Black's Law Dictionary, 1164 (4th ed. 1968), defines "motive" as "cause or reason that moves the will and induces action . . . An inducement, or that which leads or tempts the mind to indulge in a criminal act." For purposes of sec. 904.04(2), Stats., it is clear that the second and more particular definition applies—"that

which leads or tempts the mind to indulge in a criminal act." In *State v. Amundson*, 69 Wis.2d 554, 569, 230 N.W.2d 775 (1974), this court observed that the rule of exclusion of prior crimes evidence contains exceptions "to show the *elements of the specific crime charged*, intent, knowledge, motive . . ." (Emphasis added.) The specific crime the defendant here was charged with was attempted murder. The state contends the motive for that crime was the defendant's concern that Fontanez would "snitch" on him for his involvement in the October 7 shooting. Were the charges arising from that shooting tried separately from the attempted murder charge, we would agree that evidence relating to the October 7 shooting would be admissible to show the defendant's motive in the attempted murder charge. But the defendant's acts in shooting through the windows of another person's house one month before the Fontanez shooting does nothing to establish his motive for shooting Fontanez.

Nor is the "intent" exception applicable under these facts.

The state's argument on intent is also directed to his intent in visiting Fontanez' house, not the intent element of the charged crime; attempted murder. Our cases make it clear that the "intent" exception refers to the intent that is an element of the charged crime, here "intent to kill."[5] In *Whitty v. State*, 34 Wis.2d 278, 292, 272 N.W. 2d 842 (1967), this court referred to the intent exception among "elements of the specific crime charged."

McCormick, *Evidence* (hornbook series), p. 450, 451, sec. 190, also discusses the intent exceptions to the rule of exclusion of other crimes evidence in particular terms, as the "specific intent required for a particular crime."

Evidence of the "house shooting" is not probative of the defendant's intent to kill Fontanez, nor is it probative of the motive that allegedly led him to form that intent.

---

[5] Sec. 940.01, Stats.

Had the attempted first-degree murder charge been tried separately, this evidence would not have been admissible to show motive or intent. Because this case is remanded for retrial on the attempted first-degree murder charge, it is unnecessary to determine whether the error was harmless.

As to the Bermudez shooting, the state contends the evidence was admissible to show absence of mistake or depravity of mind.

This court held evidence of prior conduct admissible for the limited purpose of showing the defendant's acts evinced a depraved mind, an element of the charge of injury by conduct regardless of life, in *Kuta v. State,* 68 Wis.2d 641, 299 N.W.2d 580 (1975), and *Hammen v. State,* 87 Wis.2d 791, 275 N.W.2d 709 (1979). In both cases, the court recognized that the admissibility of prior misconduct to show the defendant's state of mind "depends in part upon its nearness in time, place and circumstances to the alleged crime or element sought to be proved." *Whitty, supra,* 34 Wis.2d at 291.

In *Kuta,* the court found "the elements of place and circumstance, while not identical, are similar." *Kuta, supra,* 68 Wis.2d at 645. In *Hammen,* prior conduct was "closely related to the offense charged in time, place and substance." *Hammen, supra,* 87 Wis.2d at 799. In the present case the house shooting was only remotely related to the charged crime in all three respects. The time of the earlier misconduct was almost three weeks before the offense charged. The place was in another part of the city. Finally, the circumstances of the prior conduct, shooting through a house window, were too dissimilar to link the earlier shooting to the defendant's state of mind during the later incident where an argument occurred in a parked car in a parking lot.

We agree with the trial court's original view that this evidence tended to show only the defendant's character, or, in the words of the prosecutor, that the defendant "is

in fact dangerous, he does attempt to threaten and intimidate people." This is precisely what the exclusion of other crimes evidence seeks to prevent.

Finally, we turn to the state's contention that the house-shooting incident disproved accident in the discharge of the gun in the October 7 shooting.

The defendant was not claiming unfamiliarity with firearms as to why the gun went off in the car, but rather that it was struck by someone else.[6] We conclude that testimony of the earlier shooting into the house was not admissible to show absence of accident.

The error was harmless whatever formulation of the harmless error rule is used. It does not appear that the result might probably have been more favorable to the defendant if the error had not occurred. We conclude there is sufficient evidence other than and uninfluenced by the house-shooting testimony which would convict the defendant beyond a reasonable doubt based on reasonable probabilities. It is clear from the record that the error either did not influence the jury or had only slight effect. *Pohl v. State,* 96 Wis.2d 290, 311–312, 291 N.W.2d 554 (1980) ; *Novitzke v. State,* 92 Wis.2d 302, 308, 284 N.W. 2d 904 (1979) ; *State v. Sarinski,* 91 Wis.2d 14, 55, 280 N.W.2d 725 (1979) ; *State v. Jennaro,* 76 Wis.2d 499, 509, 251 N.W.2d 800 (1977).

Both Fontanez and Bermudez testified that the defendant pulled a gun on Cavazos, the fourth passenger in the car, during an argument. Fontanez testified the defendant "said he was going to kill him [Cavazos] or something like that." Fontanez and Cavazos both testified that Cavazos hit the gun, which then fired hitting both Cavazos and Bermudez.

This testimony, wholly apart from the improperly admitted testimony about the house-shooting under the above tests, was sufficient for the jury to find defend-

---

[6] This claim was substantiated by two other witnesses.

ant's conduct "imminently dangerous to another and evincing a depraved mind, regardless of human life."

In *LaTender v. State*, 86 Wis.2d 410, 430, 273 N.W.2d 260 (1979), this court stated that:

"Aiming a gun at a vital part of a person's body at close range coupled with threats to kill has been held to show a depraved mind . . ."

There is no question that such conduct is imminently dangerous. The jury could also find that defendant's actions caused great bodily harm.

Finally, the defendant claims that he was deprived of due process because the trial court's instruction on self-defense misstated the law. In his instruction, the court stated:

"If you find that the defendant *did intentionally cause great bodily harm* to Mr. Fontanez but that he did so under circumstances that under the law is self-defense, as it has been explained to you, such use of force was privileged. Then you must find the defendant not guilty of attempted first degree murder giving him the benefit of doubt—giving him the benefit of any reasonable doubt as to whether his conduct was privileged under the law of self-defense. In other words, before you can find the defendant guilty of attempted first degree murder you must be satisfied beyond a reasonable doubt from the evidence in this case that the use of force by him against Mr. Fontanez was not privileged under the law of self-defense as has been defined for you in these instructions."

The court selected the phrase "did intentionally cause great bodily harm" from among a series of clauses enclosed in parenthesis in the standard jury instruction on self-defense. The choice of the "great bodily harm" clause was clearly incorrect because great bodily harm is not an element to be proved on an attempted first-degree murder charge.

Because the defendant's conviction on the attempted murder charge is reversed and the cause remanded for a new trial, it is unnecessary to determine whether this error was harmless.

The judgment of conviction on the count of injury by conduct regardless of life is affirmed. The judgment of conviction on the count of attempted first-degree murder is reversed, and the cause remanded to the Circuit Court for Milwaukee County for a new trial.

*By the Court.*—Affirmed in part, reversed in part and remanded for further proceedings not inconsistent with this opinion.